AUGUST KAUFMANN et al., Appellants, v. ANNUITY REALTY COMPANY, RAILWAY EXCHANGE BUILDING COMPANY, HARGADINE-McKITTRICK DRY GOODS COMPANY et al.

Division Two, December 29, 1923.

1. **JUDGMENT: Collateral Attack for Fraud: Privies.** Parties to an action, and those in privity with them, are not permitted to attack collaterally for fraud a judgment rendered therein.

2. ———: **Reversal Upon Stipulation: Collateral Attack by Privies.** A suit was brought by certain stockholders of a dry goods company, and all stockholders similarly situated were invited to join in the suit, and plaintiffs in the present suit, being stockholders similarly situated, employed attorneys to look after their interests and they here allege that their interests were involved there. There was a judgment for plaintiffs in that suit appointing a receiver for the dry goods company to bring such suits as were necessary to preserve its assets, and on appeal to this court the judgment was reversed upon stipulations of the parties filed. In the present suit, brought to impress with an equitable lien a building and lot with a named sum of money, on the ground that the funds of the dry goods company, by *ultra vires* acts of its officers, were invested in the property, the plaintiffs allege that they knew

Kaufmann v. Annuity Realty Company.

nothing of the stipulation to reverse the judgment in the former case and they charge that in the disposition of the case fraud was practiced upon this court. *Held*, that when a class suit is brought by one or more persons for themselves and all others similarly situated, such others are virtually represented and concluded by the .judgment; and plaintiffs cannot collaterally attack the judgment of reversal in the former suit on the ground of fraud, but are bound by it in this collateral proceeding, and can attack it only by a direct proceeding brought for that purpose, or by intervening in that suit.

3. ———: ———: ———: **Same Cause of Action.** Where the money of the dry goods company alleged in the former suit of stockholders to have been misappropriated is the same money alleged in this action to have been misappropriated by the same *ultra vires* .acts of its officers, and the same fraudulent deals appear in both cases, and the issues as to the fraudulent transactions which give rise to the cause of action are the same; and the plaintiffs, also stockholders of the said company, employed attorneys to protect their interests in the former suit, and they expected to obtain in that suit the same relief they ask in this, and this suit was brought because they could not obtain justice in that on account of the bad faith of the parties conducting it, the cause of action in both suits is the same.

4. ———: ———: ———: ———: **Different Relief: Different Parties But Successive Relationship.** Where the plaintiffs in the former suit had a right to litigate every issue presented in the present suit, the cause of action is the same, and the judgment in the former is a bar to a renewal of the action until it is set aside by a direct proceeding. The fact that in the present suit a special lien against real estate is asked does not differentiate it from the former, if in that a receiver was appointed and he brought suit to enforce a lien for the unlawful appropriation of the same money. Nor are the parties different if two companies made defendants in this were defendants in the receiver's suit to enforce the lien, though not otherwise parties; nor if the board of directors of the dry goods company made defendants in the former suit and a different board are made defendants in this, for the successive relationships of defendants constitute a privity, and the plaintiffs are following the same fund, and custodians of the fund, though changed, are charged with the same trust.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Curlee & Hay* and *Charlton A. Alexander* for appel-
lants.

(1)   Assuming that the parties plaintiff and de-
fendant in this case constitute all of the necessary and
proper parties, the petition clearly states facts sufficient
to allege a cause of action for the establishment and en-
forcement of an equitable lien and the appointment of a
receiver.   In following trust fund a court of equity will,
so far as possible, aid the *cestui que trust* by indulging
every reasonable presumption in his favor and giving
him the benefit of every doubt.   L. R. A. 1916C, 88 (n);
26 R. C. L. 1348; Harrison v. Smith, 83 Mo. 210; Stollar
v. Coates, 88 Mo. 514; Phillips v. Overfield, 100 Mo. 466;
3 L. R. A. 1916 C, note 21 et seq.; Hynds v. Hynds, 274
Mo. 123; Clark on Equity, p. 397; Pearson v. Haydel,
90 Mo. App. 264; Bircher v. Sheet Metal Co., 77 Mo.
App. 509.   (2)   All necessary parties defendant are
properly before the court.   (3)   The parties plaintiff are
properly before the court with full authority to prosecute
this cause on behalf of the McKittrick Company.   Lafay-
ette v. Neely, 21 Fed. 738; Hingston v. Montgomery, 121
Mo. App. 451, 458; Albers v. Merchants Exchange, 45
Mo. App. 220.   Nor is any request of the directors or
others having the management of the corporation to
bring the suit necessary where it appears that the cor-
poration is under the control and domination of those
who are charged with the fraudulent acts.   6 Fletcher
Cyc. Corp. par. 4070; Doctor v. Harrington, 196 U. S.
579, 49 L. Ed. 606; Delaware & H. Co. v. Albany Co., 213
U. S. 435, 53 L. Ed. 862; Slattery v. The St. Louis Co.,
91 Mo. 217.   It is not necessary to appeal to the directors
or stockholders in control where it appears that such
a suit would be detrimental to their interests and their
interests are detrimental to the interests of the corpo-
ration.   Hyams v. Calumet & Hecla Mining Co., 221
Fed. 529; Ogden v. Gilt Edge Co., 225 Fed. 723.   (4)

Kaufmann v. Annuity Realty Company.

There has been no bar of the Statutes of Limitation. There is no question of adverse possession in favor of the present legal holders of the title, because, in the first place, the time has not elapsed to perfect such a bar, and in the second place, the rights of the Hargadine-McKittrick Dry Goods Company have been known by all of the defendants and certain phases of these rights have been asserted in one way or another since 1915. This suit was filed in June, 1921. This is a petition in equity to declare a resulting trust and to enforce same through an equitable lien. Johnston v. Johnston, 173 Mo. 91, l. c. 121-VI. Limitation does not start to run while the affairs of the corporation are under the control of the parties guilty of the *ultra vires* acts and other wrongs complained of. Whitney v. Dabney, 171 Cal. 621, 154 Pac. 312; Burdett v. May, 100 Mo. App. 13. (5) This suit is not barred by laches or acquiescence. In equity there is no fixed rule nor absolute precedent for the application of the doctrine of laches. Each case must stand upon its own facts within the sound discretion of the court. Kellogg v. Moore, 271 Mo. 181; Troll v. St. Louis, 257 Mo. 625; Marshall v. Hill, 246 Mo. 1. (6) It does not appear that there is another action pending or that there has been such an action disposed of as will amount to grounds of abatement of this suit or the application of the doctrine of *res adjudicata*. If counsel for the defense desire to insist upon these points, the proper way to raise them is by a plea in abatement of this action and not by demurrer.

*Bryan, Williams & Cave* for respondents.

(1) The petition of plaintiffs fails to state a cause of action. (a) The allegations of fact in the petition plainly show that all transactions of the Annuity Realty Company and the St. Louis Union Trust Company were fair and honest. The use of epithets, or general allegations of fraud, are at the most but legal conclusions, and

are not sufficient to constitute a statement of a cause of action. Nichols v. Stevens, 123 Mo. 96; Hoester v. Sammelmann, 101 Mo. 619; Hardt v. Heidweyer, 152 U. S. 547; Gittings v. Jeffords, 239 S. W. 84; 9 Ency. Pl. & Pr. 688. (b) The transfers of the underlying leaseholds to the Annuity Company did not take place until 1912, and such transfers, and the contracts and transactions in connection therewith, were fair and reasonable business arrangements; and among other considerations received therefor by the McKittrick Company, these transactions relieved the McKittrick Company of its obligations relating to the leaseholds and the building to be erected thereon and other burdens under which it was then laboring. They were not *ultra vires*. Hendren v. Neeper, 279 Mo. 125; Tanner v. Lindell Ry. Co., 180 Mo. 1; Johnson v. United Railways, 227 Mo. 423; Johnson v. United Railways, 243 Mo. 278; Realty Co. v. American Surety Co., 238 S. W. 494; 14 C. J. 496. (c) The transactions complained of in appellant's bill were completely executed and completed ten years ago, and the plea of *ultra vires* cannot be used as a sword to recover back money paid or property delivered under such executed transactions. National Bank v. Francis, 246 S. W. 326; Schlitz Brewing Co. v. Poultry Co., 287 Mo. 400; Kerfoot v. Bank, 218 U. S. 281; St. Louis Ry. Co. v. Terre Haute Ry. Co., 145 U. S. 393. (d) Appellants' petition in substance seeks a rescission and setting aside of the transfers, made for a valuable and adequate consideration, by the McKittrick Company to the Annuity Realty Company, but the petition is without equity—disregards entirely the rights of third persons (the holders of Annuity certificates and the holders of Railway Exchange Building Company bonds) and does not state facts sufficient to constitute a cause of action for rescission. Johnson v. United Railways, 227 Mo. 423; Tanner v. Lindell Ry. Co., 180 Mo. 1; Dimpfell v. O. & M. Ry. Co., 110 U. S. 209. (e) This is a stockholders' suit, brought by three plaintiffs as stock-

holders in the McKittrick Company, to recover upon an alleged right of that company, but plaintiffs fail to state a cause of action; because their petition affirmatively shows, first, that they made no effort to obtain action by the corporation through its officers or board of directors, and second, plaintiffs never, at any time, brought the matter to the attention of the stockholders as a body. Loomis v. Missouri Pacific Ry. Co., 165 Mo. 469; Vogeler v. Punch, 205 Mo. 558; Hawes v. Oakland, 104 U. S. 450; Dimpfell v. O. & M. Ry. Co., 110 U. S. 209; Heinz v. Bank, 237 Fed. 942. (f) Appellants' petition shows on its face that the alleged cause of action here sued upon, even if it ever existed, is barred by laches and acquiescence of the McKittrick Company and of the appellants. Burgess v. St. Louis Ry. Co., 99 Mo. 496; Loomis v. Missouri Pacific Ry. Co., 165 Mo. 469; Tanner v. Lindell Ry. Co., 180 Mo. 1; Bliss v. Prichard, 67 Mo. 181; Wood v. Carpenter, 101 U. S. 135; Kessler v. Ensley, 123 Fed. 546. (g) The petition on its face shows that the alleged cause of action is barred by the Statute of Limitations. Johnson v. United Railways, 243 Mo. 278; Landis v. Saxton, 105 Mo. 486; Hudson v. Cahoon, 193 Mo. 547; Reed v. Painter, 145 Mo. 341. (2) The demurrers should also be sustained on the ground, which is stated in the demurrers, that there is another cause of action pending in the circuit court between the same parties or their privies for the same cause. R. S. 1919, sec. 1226; Dana v. Morgan, 219 Fed. 313; Johnson v. Railway Co., 243 Mo. 278.

*Nagel & Kirby* also for respondents.

(1) The petition shows, either by express averment therein or by reference to other papers or records that are mentioned and used therein, that the cause of action herein sued upon had already been asserted, compromised and settled in a prior (the Zeitinger receivership) case, which is still pending in the circuit court, for the purpose of carrying into effect the stipulations of

settlement and the mandate of this court, by which said settlement was directed to be carried into effect. Consequently, the petition shows that plaintiffs have. no unadjudicated cause of action. Kilpatrick v. Roberts, 278 Mo. 257, 263; Givens v. Thompson, 110 Mo. 432, 443; Johnson v. United Railways, 243 Mo. 278, 286. (2) To the extent that the petition seeks to attack the integrity of said mandate and stipulations of settlement, it states no cause of action because: (a) It discloses that there is another prior cause of action pending (the Zeitinger Case) in which certain stockholders, as representatives of all the stockholders, including these plaintiffs, are now seeking to attack the integrity of said mandate and stipulations on the same grounds here alleged. R. S. 1919, sec. 1226. (b) This is a collateral attack on a judgment and mandate of this court in another suit by stockholders who were represented in the suit wherein judgment was rendered. (c) If plaintiffs considered themselves aggrieved by said mandate and stipulations of settlement they had an adequate direct remedy by intervention in the Zeitinger Case, and by promptly calling the attention of this court to their contention that this court had been "imposed upon," and that the stipulations were "fraudulent." Being in legal effect "parties" to this Zeitinger Case, this was their only remedy. Not having availed themselves of said remedy, but having acquiesced in the settlement, they are bound by the mandate and by its settlement of the "equitable lien suit." Johnson v. Realty Co., 167 Mo. 325, 339; Hines v. Hines, 243 Mo. 480, 495; Emmett v. Aldridge, 231 Mo. 124, 129; Dana v. Morgan, 219 Fed. 313, 316. (3) The Zeitinger Case was a representative suit, in which the stockholders as "a class" sued on behalf of the corporation, and in which the litigating stockholders were the representatives or agents of all the stockholders, with power to control and compromise the claims sued upon. 3 Cook on Corps. (7 Ed.) sec. 748, p. 2738; Willoughby v. Chic. J. Ry., 50 N. J. Eq. 656, 666; Innes v. Lansing, 7 Paige (N. Y.) 583; 15 Encyc. of Pl. & Pr.

pp. 627, 635, 637; Brinkeroff v. Bostwick, 99 N. Y. 185, 194. The compromise of such a suit, negotiated and concluded by the stockholders who, as plaintiffs or interveners, represent the interests of all the stockholders, when sanctioned by the court, is binding on all of the stockholders, whether they are parties to the suit or not, and whether they consent or not. Johnson v. Miller, 96 Fed. 274; Bernheim v. Wallace, 217 S. W. (Ky.) 921; Belmont Nail Co. v. Columbia Co., 46 Fed. 338; Fay v. Erie Bank, Harr. Eq. (Mich.) 194, 196. (4) Even if the mandate and the stipulations of settlement had been subject to timely attack (which we deny), the petition shows that plaintiffs in the instant case are in no position to make such attack because they acquiesced from February, 1919, to June, 1921, in the mandate and settlement and in the circuit court proceedings during the mandate; and the *status quo ante* having been materially changed by the partial but substantial carrying out of the mandate prior to June 17, 1921, plaintiffs are now estopped to re-assert claims that had already been compromised and settled on behalf of all the stockholders. Dana v. Morgan, 219 Fed. 316.

*Curlee & Hay* and *Charlton A. Alexander* for appellants in reply.

It could not be anticipated that counsel for respondents would go so far afield in their briefs in drawing into this case the Zeitinger Case. Let us consider this Zeitinger suit which counsel so confidently claim precludes this action. (1) In the first place, who were the parties to that suit? Zeitinger and others, as stockholders of the McKittrick Company, were plaintiffs; and (after eliminating all defendants as to whom the suit was dismissed in the lower court) these were the defendants: The Hargadine-McKittrick Dry Goods Company, Thomas H. McKittrick, Hugh McKittrick, Walter McKittrick, Ralph McKittrick, Charles C. English, Martin P. Donahoe, George B. Haliday, George H. Allen, E. C. Sim-

mons, George M. Wright and Ely & Walker Dry Goods Co. A careful comparison is not necessary to see that the suits are not between the same parties, the first two named being the only ones who are parties defendant to this suit. (2) What about the subject-matter of the Zeitinger suit? The petition was lengthy, and prayed for an equitable lien, as in this suit (among many other grounds for relief prayed for), but the claim for an equitable lien was dismissed without prejudice, because the proper parties were not before the court. The suit was also dismissed as against most of the other defendants who are defendants here, without prejudice. Furthermore, this suit contains all of the necessary parties to an equitable lien suit, including the bondholders and Annuity certificate holders, who were not even original parties in the Zeitinger suit. So it is clear the court did not have before it the question of the relief asked in this case. The sole matters before this court in the other case were the question of the appointment of the receiver of the McKittrick Company, and the findings against the other defendants on their personal liability to the McKittrick Company, who personally were held to be accounting parties for the money which they had diverted from the business. That is all. It was not alleged that the defendants in the Zeitinger suit before this court got the money themselves, but the proof shows that they diverted it to others for their own purposes. Zeitinger tried to recover from the actual parties occupying trust capacity who diverted the funds; this suit seeks to establish a lien against the property of the parties who got the money with full knowledge, and who still have it. Even a final judgment in the Zeitinger suit affirming or dismissing the decree of the lower court would not have been res adjudicata as to these defendants, who got the money, because the question presented by this appeal was not before this court then, and the question of fastening a paramount lien as to these other defendants was dismissed by the lower court without prejudice to the plaintiffs, or any other stockholders in be-

half of the company, to bring another suit for an equitable lien. Then the decree of this court pursuant to the stipulations cannot be *res adjudicata* on something not before it, and as to persons not before the court, even if this court had reversed the lower court and dismissed the petition on the merits. How then can it be *res adjudicata* on anything short of that? (3) An unsuccessful suit against one joint tortfeasor does not preclude another suit against the other, even if the other was made a party to the first suit, if the suit was dismissed without prejudice as to the other. (4) But it is claimed that the receiver had brought a suit for an equitable lien against the proper parties. That is true. But on the stipulations, which were unauthorized, this court reversed and dismissed the Zeitinger suit, and added a clause, based upon the stipulations, that the equitable lien suit also should be dismissed. That is very extraordinary. This court could only reverse and dismiss the suit before it. Such a dismissal would have carried with it the dismissal of the receiver and the claims against the individuals. The dismissal of the receiver, pursuant to the mandate, would have carried with it the equitable· lien suit brought by the receiver, and since claim for an equitable lien had been originally dismissed without prejudice, the stockholders could have brought another suit for an equitable lien, as we have done, or come in and asked to be substituted as parties in the receiver's suit in his stead. But this latter course could not be followed after the suit was dismissed, and the receiver discharged, and intervention in that suit then would have been a vain thing. When the mandate of this court was presented to the lower court it had no other apparent option than to dismiss the equitable lien suit of the receiver, since the superior court had ordered it. (5) A settlement or compromise by stockholders suing on behalf of the corporation, which is not approved by the court, does not preclude other stockholders to sue on the same cause of action. The dismissal of the equitable lien suit by the lower court under the mandate was not proper, because

the mandate itself was not proper. Therefore, there has been no judicial approval of that dismissal. This legal principle is grounded in sound reasoning, otherwise a group of stockholders could settle a suit brought on behalf of the corporation on a fraudulent arrangement beneficial to themselves. Brinkerhoff v. Bostwick, 99 N. Y. 185. See also Grant v. Copper Company, 154 N. Y. Supp. 596. (6) The stipulations in the Zeitinger Case were nothing more than an unauthorized contract. Judgments by consent create an estoppel of the parties consenting, but are not *res adjudicata*. One who does not consent is not bound. Chaud on Res Adjudicata, sec. 58, p. 125; Black on Judgments, 705-6, 842-3. The setting aside or vacation of a consent judgment, it seems, may be had on such material as would enable the court to set aside or vary an agreement between the parties. Attorney-General v. Tomline, 7 Ch. Div. (Canada) 388. (7) A consent judgment is nothing more than a contract between the parties thereto, and if same is unauthorized or illegal, can be attacked by parties interested. Union Bank v. Commissions of Oxford, 119 N. C. 214, 34 L. R. A. 487; Kelly v. Milan, 127 U. S. 139; T. & P. Railroad v. Southern Pac. Ry., 137 U. S. 48; Lawrence Mfg. Co. v. Jonesville Cotton Mills, 138 U. S. 552; Mo. Pac. Ry. Co. v. Lusca, 21 L. R. A. (N. S.) 338; Collins v. Trotter, 81 Mo. 275; Kingsbury v. Buckner, 134 U. S. 650. (8) It is alleged in the petition that the dismissal of the Zeitinger suit was a constructive fraud on the court, and this included the dismissal of the equitable lien suit on the stipulation of the parties. We alleged that in good faith, and it is presumed that we can prove it. We also alleged that the Zeitinger plaintiffs were and are now acting in the interests of the stockholders as a whole. We can prove it. In view of this situation, and the fact that the lower court in that proceeding was compelled to follow the Supreme Court's mandate, an intervention in that cause, controlled by those plaintiffs, would have been a most fruitless effort. Furthermore, these plaintiffs did not have to take that course; the suit for an

equitable lien had never been properly dismissed, and they still had their right to prosecute same, as alleged in the beginning. Then, if the dismissal of the equitable lien suit was a constructive fraud, and these and other plaintiffs had been sold out by those whom they were trusting, as alleged, these plaintiffs surely are entitled to prove these facts, which will entitle them to relief. (9) On the subject of *res adjudicata* we call the court's attention to the case of Metropolitan Elevated Co. v. Manhattan Elevated Co., 11 Daly (N. Y.) 373. (10) Laches and acquiescence do not attach so long as there is a suit pending through which the parties might be able to obtain relief. Bogart v. Southern Pacific Co., 215 Fed. 218.

WHITE, J.—The plaintiffs, as stockholders in the Hargadine-McKittrick Dry Goods Company, brought this suit on behalf of themselves and any other stockholders of said company who might come into court with clean hands and join in the proceeding. The purpose of the suit is to obtain a decree in behalf of the McKittrick Dry Goods Company, impressing with an equitable lien, for the sum of $2,657,781.17, Block 128 in the city of St. Louis, upon which is erected the Railway Exchange Building, on the ground that the funds of the Hargadine-McKittrick Dry Goods Company, by the *ultra vires* acts of its officers, were invested in the property.

This case is one of the kind that gives rise to the popular notion of the law as a recondite puzzle, which only those initiated in the mysteries of the legal profession can ever solve. The prevailing idea is that difficult lawsuits and tangled problems which present themselves to the courts are due to the obscurity of the law whose esoteric principles are so mysterious that even the lawyers themselves and the judges of the court do not agree as to what the law is when applied to particular cases. Whereas, the record here shows it is not the law which is mysterious; it is the methods and operations of business men. Difficult cases arise from complicated business transactions. In this case the nu-

merous transactions, the many corporations organized through the same agency and apparently conducted with a view to the same ultimate end, the contracts, deals, interlacing and overlapping schemes and projects which are involved, require long and intense study in order to understand and disentangle the facts so as to apply the law to them. It took several years and the labor of astute business minds, stimulated by adversity and threatened disaster, to conceive and carry on the various plans and enterprises which appear in the record here. It is not the law of the case, but the facts of the case, which are difficult to understand.

Demurrers to the bill filed by some of the defendants were sustained by the trial court; the plaintiffs declined to plead further, their bill was dismissed, and from that judgment they appealed.

The petition, eighty-four printed pages, alleges that plaintiffs are stockholders in the Hargadine-McKittrick Dry Goods Company, possessing fully-paid-up stock of the par value of $66,000; that the Hargadine-McKittrick Dry Goods Company was incorporated in 1889 with a capital stock of $750,000, which later was increased to $4,000,000. The company was organized ''to carry on and conduct a general dry goods and mercantile business for the purchase and sale of dry goods and such other goods and merchandise as may be desired.''

In 1905 Thomas H. McKittrick, president of the company, conceived the idea of becoming a ''Captain of Industry'' and ''Dry Goods King'' and began, and thereafter carried on, a series of bold speculations whereby he diverted the funds of the McKittrick Company from their legitimate purpose by *ultra vires* acts, his enterprises finally resulting in the building of the Railway Exchange Building. The plaintiffs interpolated in the petition a great many statements as to the unlawful, ruthless, surreptitious and fraudulent character of the numerous acts of which Thomas H. McKittrick was guilty throughout all his deals. Many of those statements are arguments, conclusions and generalizations made, appar-

ently, *in terrorem.* However superfluous these may be, as the defendants claim, there remains a tremendous volume of alleged facts which constitute the plaintiffs' alleged cause of action.

In July, 1905, the Hargadine-McKittrick Dry Goods Company, through result of negotiations of Thomas H. McKittrick, became the half-owner of the business of William Barr Dry Goods Company, which occupied a building covering the east half of Block 128 in the city of St. Louis. Soon afterwards, in order to gain absolute control of the McKittrick Company, he procured from the stockholders of that company a voting trust agreement whereby they surrendered their stock to the St. Louis Union Trust Company, defendant herein, as trustee, and received in return certificates of such company for like amounts. The plaintiffs and other innocent stockholders had confidence that the business would be properly managed, but the purpose of McKittrick was to keep the stockholders in ignorance of the moves which he had in contemplation. In January, 1906, the McKittrick Company bought the remaining half of the Barr Dry Goods Company business.

Then, "under the guise and ostensible purpose of providing a home for the Barr business," Thomas H. McKittrick proceeded to organize six "dummy corporations," which corporations proceeded to obtain long-time leases from the owners thereof on different tracts of land in Block 128. Those dummy corporations had no assets and were entirely controlled by Thomas H. McKittrick, who concealed from the stockholders in the McKittrick Company the nature of his plan, which was to get control of the entire Block 128 and to erect a monumental building thereon. Likewise, each of the owners and lessors of the different tracts presumably was unaware of the deals made with the others. As a condition for obtaining the leases McKittrick and his associates were required to guarantee the erection of a building on the several tracts, and the guaranties were supported by McKittrick and others depositing bonds

and executing other obligations.  The McKittrick Company was unlawfully made liable on those obligations. At the same time McKittrick contracted with the May Department Store Company to erect a building on Block 128, to lease it to the May Department Store Company. Said building was to cost the sum of four million dollars.

The leases were required to be carried for several years before any return could be had from the building to be erected.  In taking said leases liability for large sums of money was incurred for rentals and other expenses incidental to procuring the leases and were paid by money fraudulently and secretly taken from the treasury of the Hargadine-McKittrick Dry Goods Company. The money so diverted amounted in all to $1,827,792.50. All of these acts were alleged to be *ultra vires* and beyond the power of the company as contemplated in its charter.  The petition, however, says that the leasehold estates when acquired were worth all they cost, and that the McKittrick Dry Goods Company, by reason of the money so expended, became seized and possessed of an equitable lien on the said leasehold estates, in the sum mentioned.

After Thomas McKittrick had thus laid the foundation for carrying out his monumental scheme he was confronted with other difficulties.  To build so large a structure as contemplated required a large sum of money, which had to be raised in some way.  In order to secure the money it was important to show that it would be a paying investment, and that he had prospective tenants who would occupy the building when it was completed.  Therefore he made arrangement with different railway companies to lease portions of the prospective building, and in turn was obliged to secure them against liability on leases which they already had in other quarters.

In carrying out these schemes which resulted in the erection of the Railway Exchange Building, one of the largest office buildings in the world, Thomas H. McKittrick betrayed a business sagacity, a boldness of enter-

prise, and a resourcefulness in projecting and carrying forward plans contributing to his ultimate purpose that seemed to justify his alleged ambition to be known as a "Captain of Industry." The petition compliments him in the conduct of his enterprise by saying in effect that he was entirely without scruple or consideration for anybody except himself and his immediate associates; that he carried through his plans in utter disregard of the rights of plaintiffs and the other stockholders whose interests he hazarded; that he perpetrated frauds of great magnitude and concealed them with great ingenuity and success.

It is entirely unnecessary to state the numerous plans, transactions and schemes in which McKittrick engaged as he fought for years to accomplish the construction of the Railway Exchange Building. It is sufficient to state the final condition of the property and the interests of the defendant as they appear at the time this suit was brought.

In 1911 Thomas H. McKittrick, Robert McKittrick Jones, John D. Filley, the St. Louis Union Trust Company, and others, formed what was called the Building Syndicate, which constituted Robert McKittrick Jones and John D. Filley as syndicate managers.

The appellants in their brief have thus interpreted some of the allegations of the petition as to subsequent transactions:

"In November, 1911, said Syndicate Managers entered into a contract with the St. Louis Union Trust Company, as trustee, and subscribers to the annuity certificates and the subscribers to the bonds, in which the details of the plans are set out. The important features of this contract appear in the petition on page 31 of the record. In this contract Jones and Filley agreed to acquire from Thomas H. McKittrick the leasehold estates to all of Block 128, said leaseholds to be taken in the name of a concern to be organized, to be known as the Annuity Company, defendant herein, without any consideration moving from the Annuity Realty Company to

the Hargadine-McKittrick Dry Goods Company, the equitable owner of same. It was, furthermore, planned that the Annuity Realty Company would sublet the said leasehold estates to another corporation of their creating, to be known as the Railway Exchange Building Company, at an increased rental enuring to the Annuity Realty Company of at least $100,000 a year. It was also agreed to issue bonds of the Building Company against the building and lots in excess of $2,000,000. By this means the Annuity certificate-holders should receive without consideration an enormous return, sufficient to pay them as annual interest on their certificates, and a sinking fund of $32,000 a year to retire their certificates in full in forty years. It was also planned to make the bonds of the Building Company a first lien on the property, ahead of the rights of the McKittrick Company. In an attempt to give some color of consideration to the McKittrick Company for its enormous outlay of funds it was agreed that the Building Company should have a capital stock of $2,000,000, of which seventeen-twentieths should go to the McKittrick Company; but it is alleged that this stock was wholly fictitious and represented no value whatever, and that no delivery whatever has even been attempted to be made to the McKittrick Company of any evidence of such holdings. Thus, as is alleged, the interests of the McKittrick Company, which were prior, were completely sacrificed for the furtherance of the ends of Thomas H. McKittrick and his associates, and the subscribers to the Annuity securities and the bonds."

And in further condensing the allegations of the petition the brief continues:

"On December 14, 1911, the accounts held by the McKittrick Company against the dummy corporations, amounting to $912,156.06, were attempted to be assigned to Jones and Filley, syndicate managers. This is also alleged to have been wholly void, for the reasons above given.

"On January 4, 1912, pursuant to the fraudulent scheme to defeat the McKittrick Company in its rights,

the Railway Exchange Building Company was organized with a capital of $50,000, which was equally subscribed for by Jones and Filley, except for three other nominal subscribers for one share each, but none of the said capital was paid in by the said subscribers.

"On March 26, 1912, the Annuity Realty Company was organized with a capital stock of $3000, with three 'straw' men as subscribers to $1000 each of the capital stock, none of which stock was paid in.

"On April 1, 1912, Thomas H. McKittrick's dummy corporations assigned to the said Annuity Realty Company the leasehold estates on Block 128. The leases were signed by Thomas H. McKittrick and a party who was an official of the St. Louis Union Trust Company as secretary. The leases recited considerations of one dollar, although no consideration whatever was paid. This assignment was made, although there had previously been a so-called assignment of the same leases to Jones and Filley, syndicate managers, as hereinbefore alleged. These assignments are alleged to have been void, because they were a perversion of the trust funds rightfully belonging to the McKittrick Company. It is also alleged that the stockholders of the McKittrick Company, including these plaintiffs, had no knowledge or notice whatever of this transaction.

"On the same date the Annuity Realty Company leased to the Railway Exchange Building Company Block 128 for a period of eighty-eight years for an increased rental of $152,092 per year. In said lease the Building Company obligated itself to create out of the revenue from the building a sinking fund of $32,000 with which to retire the annuity certificates in thirty-five years. Jones and Filley were agents for the Annuity subscribers and the bond subscribers, and their knowledge of the transaction was imputable to them. They furthermore had full opportunity to know of the scandalous transaction by reason of being parties to the contract first above mentioned."

The brief of plaintiffs then sums up the allegations as follows:

"To sum up thus far: It is alleged in the petition that the ground leases were bought and maintained with money of the McKittrick Company, without the knowledge of plaintiffs and other stockholders. It is alleged that McKittrick Company was and is, therefore, entitled to an equitable lien on the ground leases. The leases were assigned by the dummy corporations in whose names they were taken by the president of the McKittrick Company, occupying a fiduciary relation, without consideration from the Annuity Realty Company. The Annuity Realty Company leased the block to the Railway Exchange Company for a large annual increased rental, showing conclusively the value of the leasehold estates. . . .

"The bonds of the Building Company to the amount of $2,000,000 were likewise sold to persons who were parties to the agreement and had knowledge of the rights of the McKittrick Company, which bonds were intended to constitute a first lien on the building and land, ahead of the rights of the McKittrick Company. It is alleged throughout the petition that these plaintiffs and other stockholders had no knowledge of any of these transactions and no notice of anything which would have put them on inquiry, whereas, the defendants herein, including the bondholders and annuity certificate holders, had notice of all the facts alleged in the petition or had constructive notice thereof. About $500,000 additional of the McKittrick Company's money also went into the building, of which $187,500 was evidenced by the bonds of the building company purchased in furtherance of the scheme."

We take these excerpts from plaintiffs' brief because it saves some trouble in reducing to a reasonable length the numerous allegations of the petition, and because we think the plaintiffs have not understated the effect and purport of these parts of the petition.

Since the trial court sustained the demurrers and one of the principal grounds mentioned was that there was another suit pending, or had been concluded, in which the present cause of action was litigated or could have been litigated, we set out those portions of the petition relating to such other suit as follows:

"(38)   About the year 1915, some of the better informed stockholders began to be suspicious that they had been misled by the defendants as to the connection of the McKittrick Company with the leases to Block 128 and the building thereon, and one Byrns filed a bill for a receiver of the McKittrick Company. On December 18, 1915, one Zeitinger and others filed a bill for a receiver in the Circuit Court of St. Louis. The two suits were consolidated in some way, and the said Zeitinger and others sought to recover certain large sums of money which were alleged to have been fraudulently diverted from the McKittrick Company by leave of court.   .   .   .

"On January 8, 1917, a receiver was appointed for the Hargadine-McKittrick Dry Goods Company, and on March 30, 1917, the said McKittrick Company appealed from said decree without supersedeas.

"During all of this time the said matters and things were *in custodia legis,* and while these plaintiffs and other innocent stockholders of the McKittrick Company did not actively join in the said suit, or take part therein, they had employed counsel and were interested *because they felt that the action being taken in the said suit was in good faith and was being conducted for their benefit as well as all of the stockholders of the McKittrick Company.*

"Very much to their surprise this did not prove to be true, as on February 5, 1919, the said litigation suddenly came to an end in the Supreme Court; and while plaintiffs are reliably informed, and believe and charge that the Supreme Court had jurisdiction only of the question of the appointment of the receiver, the decree was reversed and ordered dismissed on stipulations of the attorneys of record in the said suit without any au-

301 Mo.—42.

thority from the stockholders *whom they represented,* and even over the protest and continued protest of said stockholders, or most of them, who were acting in good faith.

"Plaintiffs are informed, believe and so charge that the said reversal was a result of certain constructively fraudulent stipulations which were entered into without the consent of clients, whereby the Supreme Court issued its mandate directed to the lower court, commanding it to dismiss the petition of those plaintiffs, and not only was the said Supreme Court thus imposed upon, but was led to issue its mandate covering matters which were not before it, thus resulting in a constructive fraud on the Supreme Court of this State. As a result of said mandate, after certain minor and purely perfunctory details are disposed of, plaintiffs are informed and believe and allege that the Circuit Court of St. Louis under said mandate has no other course open to it than to dismiss the said bill. . . .

"Immediately upon *these plaintiffs and others similarly situated discovering that their interests had been sacrificed* in the Supreme Court without their knowledge or consent, they employed other counsel to protect their interests, but they still know nothing of the intricate details as hereinbefore alleged, and only know generally that an injustice has been done them. Furthermore, the matter has been so purposely complicated that it was, and is, a very difficult thing for anyone to ferret out the channels and means whereby the said results have been and are being accomplished *to the detriment of these plaintiffs and others.*

"Nevertheless, *plaintiffs were informed that an effort was being made on their behalf and the behalf of all the stockholders* to have the said decree set aside in some way and justice done in the matter, and since the said proceeding was pending in the said court and the mandate had not been carried out fully, they felt, as they had a right to feel, that everything was being done *to protect the interests of the innocent stockholders in the matter.* In the last few days only it has come to the

knowledge of these plaintiffs that the litigation now pending as aforesaid, is not representative of the rights of the stockholders as a whole, and that they have reason to believe and so charge that there are interests which, though apparently representing all of the stockholders, seem to be adverse to them.

"Certain information which has very recently been imparted to *these plaintiffs* leads them to believe and charge that *their interests as innocent stockholders* in the transactions are being or about to be sacrificed by reason of the fact that they cannot obtain justice fully and freely and equitably in the said cause now pending, largely and principally by reason of the fact that some of the plaintiffs do not appear to be in said court with clean hands, and therefore are not representative of the innocent stockholders of the McKittrick Company, whereby a false impression would be created upon the minds of said court and the interests of these stockholders might possibly be sacrificed as a result thereof."

The trial court in sustaining the demurrers to the petition filed a memorandum, a part of which is as follows:

"It is evident from the allegations in the petition that this suit involves the same question of diverted funds that was involved in the Zeitinger Case. These plaintiffs knew of that suit, but did not intervene. Until its unsatisfactory conclusion in the Supreme Court, they were satisfied that the Zeitinger Case would protect their interests.

"This situation is presented: The Dry Goods Company (for whose benefit the Zeitinger suit was brought) sued to recover the moneys diverted. It now sues again (the present suit being for its benefit) for the same money and proposes to try again matters that were not disposed of to the satisfaction of these plaintiffs in a former suit. The first suit appears to be still pending for some purpose, although it is also alleged that the litigation came to an end in the Supreme Court.

"It thus appears that there was litigated, or could have been litigated, in the Zeitinger suit all the cause of action alleged in this case. It is fair to assume from the petition that the Zeitinger suit was appropriate to protect plaintiffs. They knew of it, were satisfied and, although they had counsel, did not think their interests required intervention.

"It is evident that the rights of the Dry Goods Company were adjudicated in that suit and covered by the mandate. The cause of action of the plaintiffs in that suit was the cause of action of the plaintiffs here, that is, the cause of action of the Dry Goods Company. Therefore, the disposition of the Zeitinger Case disposed of the cause of action of these plaintiffs."

The trial court had before it the files and the record in the Zeitinger Case and this memorandum shows a finding by the court as to what issues were presented in that case. The Zeitinger Case was appealed to this court and the record is on file here. Both sides to this controversy invite this court to take into consideration, in determining the merits of the demurrer here, the record in that Zeitinger Case. We will not undertake to examine such record although it is before us, and will consider only such features of the Zeitinger Case as are stated and admitted by both parties in the record here.

I. The Zeitinger suit was brought by certain stockholders in the McKittrick Company, and all stockholders similarly situated were invited to join. The plaintiffs here employed attorneys to look after their interests in that case; they allege in several places that *their interests were involved there.* There was a judgment in the circuit court for the plaintiffs appointing a receiver for the McKittrick Company to bring such suits as were necessary to preserve the assets. On appeal to this court the judgment was reversed on stipulations of the parties filed in this court. It is claimed by plaintiffs that in the disposition of that case, fraud was practised upon this court, and therefore

Collateral Attack: Fraud.

they are not bound by the result, even though they had been in the position of parties to the record.

The law is otherwise. Parties to an action, and those in privity with them, will not be permitted to attack collaterally for fraud a judgment rendered therein. [Abington v. Townsend, 271 Mo. l. c. 615; State ex rel. Van Hafften v. Ellison, 285 Mo. l. c. 317; 15 R. C. L. 840-841.]

Therefore, if the plaintiffs in this case were in effect parties to the Zeitinger Case, in this collateral proceeding they are not in position to attack the disposition of that case on the ground of fraud.

The plaintiffs in this case were in effect plaintiffs in the Zeitinger Case because of what is termed their virtual representation. That suit, like this, was a class suit. Where a suit is brought by one or more persons for themselves and all others similarly situated, such others are virtually represented and concluded by the judgment. [15 R. C. L. l. c. 1024-1025; 20 R. C. L. 669, 670; Ann. Cases, 1913 C, pp. 655-658.] The appellants here apparently concede they were virtually represented in that case. They allege they were interested, employed attorneys to protect their interest in it, and expected complete relief in it. So, they are in effect parties and, for whatever the judgment is worth, they are bound by it. They cannot attack it collaterally for fraud. They might attack it for fraud in a direct proceeding brought for that purpose or by intervening in the pending suit.

II. Respondents claim that the appellants' action is barred by "another suit pending"—the Zeitinger Case. The appellants argue that neither the parties, the issues, nor the evidence required to establish the claim, are the same in the two suits. The trial court which had both cases, in his finding asserts the money of the McKittrick Dry Goods Company misappropriated as alleged in the Zeitinger suit, is the same money alleged to have been misappropriated in this suit; the same alleged *ultra vires* acts and fraudulent deals appear in both cases.

Same Cause of Action.

That the issues as to the fraudulent transactions which give rise to the cause of action are the same appears in the allegations of the petition as set out above. The plaintiffs employed attorneys there to protect their interests; they expected, in that case, to obtain the same relief which they ask here. They regarded that suit as furnishing them complete relief. This suit was brought because plaintiffs *could not obtain justice* (the justice sought here) *in that suit* on account of the bad faith of the parties conducting it; thus showing the causes of actions are the same.

It is asserted that the issues are different because in this case a specific lien is asked against the real estate, while in that case the only purpose was to appoint a receiver. While it does not appear in the allegations of the petition, it is stated by the respondent and admitted by the appellants that a receiver in the Zeitinger Case was appointed and the receiver brought suit making the Annuity Realty Company and the Railway Exchange Building Company parties defendant, for the purpose of enforcing a lien, for the same misappropriated funds, against the same property as in this case.

It is claimed that the parties are different in this suit. The Annuity Realty Company and the Railway Exchange Building Company were not parties to the Zeitinger suit: Nevertheless they are parties to the receiver suit. The members of the board of directors of the McKittrick Dry Goods Company were parties defendant in the Zeitinger suit; a different board of directors are parties to the present suit, so that to all intents and purposes the Zeitinger suit and the receiver's suit involved exactly the same remedy, the same issues, the same parties, and required the same evidence in the present case. The plaintiffs are following the same fund, and custodians of the fund though changed, are charged with the same trust. The successive relationship of defendants constitute a privity. [15 R. C. L. p. 1015; Womach v. St. Joseph, 201 Mo. l. c. 478.]

By allowing the judgment of dismissal to stand,

only such remedy is open to them as remains in the matter now pending. It appears that the record parties to the Zeitinger suit are complaining in the circuit court of the disposition of that case; so far as they have a right to complain these plaintiffs have a right to join in the complaint.

To sum up: The plaintiffs, in the Zeitinger suit and the receiver suit, had a right to litigate every issue presented in this suit. If the order of this court in reversing the Zeitinger suit was procured by a fraud upon the court, the plaintiffs, as suggested above, had their remedy and failed to pursue it. By such failure they are estopped by that judgment, whatever its effect. They still have open in the Zeitinger suit, pending, whatever is left to any stockholder, party to that suit.

The judgment is affirmed. *David E. Blair, P. J.,* and *Walker, J.,* concur.